Filed 4/16/26  P. v. Gonzalez CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ELOY GONZALEZ,<br><br>　　Defendant and Appellant. | G063418<br><br>(Super. Ct. No. 99CF0831)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

It is ordered the opinion filed herein on March 24, 2026, be modified as follows:

On page 19, delete the third sentence of the second full paragraph beginning with "We need not" and insert in its place:

We follow the California Supreme Court's interpretation of "reckless indifference to human life" (§ 189, subd. (e)(3)) as set forth in the cases discussed *ante*.

This modification does not change the judgment.

The petition for rehearing is DENIED.


                                                 MOTOIKE, ACTING P. J.

WE CONCUR:


MOORE, J.


SANCHEZ, J.

2

Filed 3/24/26  P. v. Gonzalez CA4/3 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ELOY GONZALEZ,<br><br>    Defendant and Appellant. | G063418<br><br>(Super. Ct. No. 99CF0831)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Lewis W. Clapp, Judge. Affirmed. Request for judicial notice granted.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher Beesley and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Appellant.

Eloy Gonzalez appeals from a postjudgment order denying his petition for resentencing after an evidentiary hearing under Penal Code

section 1172.6 (all undesignated statutory references are to this code). He argues he was not guilty of first degree murder under current law. He asserts insufficient evidence supports the trial court's finding he was a major participant in the underlying felony who acted with reckless indifference to human life. We disagree and affirm the postjudgment order.

FACTUAL AND PROCEDURAL BACKGROUND

Southside gang members Gonzalez, Matthew Robert Miller, and Eduardo Vargas engaged in several armed robberies. (*People v. Miller* (Mar. 22, 2004, G029025) [nonpub. opn.] (*Miller*).) In the final robbery, Vargas shot and killed a robbery victim, Jesse Muro. (*Ibid.*) We recite the facts set forth in a prior opinion:

"On the afternoon of March 30, 1999, [J.B.] and [H.K.] were robbed by two men. One of the men displayed a handgun and took [J.B.]'s pager and wallet, and [H.K.]'s checkbook and cellphone. [J.B.] identified [Vargas[1]] as the man with the gun. Later that day, Gonzalez used [J.B.]'s ATM card to pay off a pager account and to open two new pager accounts.

"On the evening of March 30, [L.H.] and [C.W.] were working on a truck parked in front of [L.H.]'s house. Miller, Vargas, and another man [whom] the victims could not identify approached. One of the men displayed a gun; Vargas took [L.H.]'s wallet. When [L.H.] started towards his house, Vargas threatened to kill him. When [C.W.] ran away, Miller chased him demanding, 'stop or I'll kill you.' Later, police found Gonzalez's fingerprints on the car stereo that had been ripped out of [L.H.]'s truck.

---

[1] The facts set forth in *Miller, supra*, G029025 indicate "[J.B.] identified Miller as the man with the gun." This sentence contains a typographical error. The record indicates J.B. identified Vargas, not Miller, as the man with the gun.

2

"On the evening of April 1, 1999, [S.C.] was entering his apartment complex near the Santa Ana Zoo when a young man with a gun approached, put the gun to [S.C.]'s head and demanded his money and watch. [S.C.] gave the man his wallet. Sometime during the encounter, a second man joined the first assailant and said, 'Let's go.' [S.C.] was told to walk and not turn around. When he started to turn and look, the man with the gun warned, 'Go back or I'll shoot.' The men left. [S.C.] could not identify his assailants.

"Shortly after the [S.C.] robbery, . . . [M.S.] and . . . Muro were walking near the same apartment complex. [M.S.] saw a man standing by a fire hydrant, and two people inside a car with the car door open. They walked past[;] . . . then [M.S.] was aware there were men behind him, he thought three of them, and there was a gun to his head. [M.S.] was warned, 'Don't turn around or I'll shoot.' One man demanded money. [M.S.] gave the man his pager and a bracelet. [M.S.] heard a gunshot and a scream. He was then pushed to the ground, with the gun to his head and again warned, 'Just don't look back or I'll shoot.' When he finally got up, he found Muro on the ground, shot in the head. Muro died later that night from two close range gunshot wounds to his head.

"A witness testified he was driving by the apartment complex when he saw four men struggling on one side of the street. He noticed a third man standing on the other side of the street, who was not part of the struggle, but as the witness drove past he looked in his rearview mirror and saw the third man run across the street towards the struggle. The witness went to a store and called the police. The witness identified [M.S.] and Muro as two of the men involved in the struggle he witnessed, but could not

3

identify the other two men. The witness had seen a car parked nearby, but it was gone when he talked to police.

"The next morning, police saw Miller and Gonzalez sitting in a car with two women . . . outside a motel room. There were open bottles of beer in the car. Gonzalez was searched; he had a large roll of money on him— $950. [M.S.]'s bracelet was in his pocket. [S.C.]'s license was found in a wallet under the seat of the car. Police searched the motel room and found Vargas's driver's license inside. In a subsequent search of Vargas's residence, police found a handgun hidden under a pillow and various items with gang graffiti on them. At Gonzalez's residence, items with gang graffiti were also found. [¶] . . . [¶]

"[City of Tustin Police] Officer [Jeffrey] Blair . . . testified to the statements made by Gonzalez after his arrest. . . . Gonzalez admitted having participated in prior robberies. Gonzalez admitted he and Vargas were Southside gang members, but claimed he was no longer in the gang.

"The night of Muro's murder, Gonzalez met Vargas and some [women] at Vargas's apartment and they drove to the Santa Ana Zoo. Vargas got out of the car, mugged someone, and then returned to the car.

"Gonzalez described Vargas as being 'amped up' after the first incident. Gonzalez got out of the car and was trying to calm Vargas down when he saw two men walking on the opposite side of the street. Gonzalez asked Vargas if the men were from 'Chachaland,' a derogatory term for the Highland Street gang. Gonzalez had been beaten up by Highland Street gang members a few days earlier. Vargas ran across the street, circled behind the two men, grabbed one by the neck, and placed a gun to the man's head. It occurred to Gonzalez that Vargas might be robbing the two men. He went across the street to back Vargas up because one of the victims was acting as if

4

he had a gun. Gonzalez yelled to Vargas that the two men were not from the Highland Street gang. He then asked [M.S.] 'what he had,' and took [M.S.]'s bracelet. Vargas was yelling at the men to not look. Gonzalez was about to take [M.S.]'s jacket when he heard gunshots. He ran back to the car and drove around to find Vargas.

"Officer Blair also testified, as a police gang expert, that Southside was a criminal street gang; Miller, Gonzalez, and Vargas were Southside members; and the crimes were committed for the benefit of the gang." (*Miller, supra*, G029025.)

Vargas was tried separately, found guilty of first degree murder, and sentenced to death. (*Miller, supra*, G029025.) The prosecution tried Gonzalez and Miller together. (*Ibid.*) The jury found Gonzalez and Miller guilty of first degree murder of Muro under section 187, subdivision (a). (*Ibid.*) As to Gonzalez, the jury found true the special circumstances allegation that he committed the murder during the commission of the robbery of Muro. (§ 190.2, subd. (a)(17)(A).) The jury also found Gonzalez guilty of the following: all the robberies charged against him (§§ 211, 212.5, subd. (c), 213, subd. (a)(2)), including robberies against Muro and [M.S.]; being a felon in possession of a firearm (former § 12021, subd. (a)); street terrorism (§ 186.22, subd. (a)); and attempted robbery (§§ 664, 211, 212.5, subd. (c), 213, subd. (a)(2)). It found true Gonzalez committed felonies for the benefit of a criminal street gang (§ 186.22, subd. (b)) and various personal and vicarious arming and gun use allegations (§ 12022.53, subds. (a), (b), (d) & (e)(1)). The trial court sentenced him to life without possibility of parole and an additional determinate term. Gonzalez and Miller appealed, and a panel of this court affirmed the judgment. (*Miller, supra*, G029025.)

5

Gonzalez later filed a petition for resentencing under former section 1170.95 (now § 1172.6). (*People v. Gonzalez* (June 11, 2021, G057502) [nonpub. opn.].) The trial court denied the petition at the prima facie stage. (*Ibid.*) Gonzalez appealed from the postjudgment order, and a panel of this court reversed that order and remanded the matter to the trial court with directions to issue an order to show cause. (*Ibid.*)

The trial court issued an order to show cause, and the parties filed written arguments in response. At the resentencing hearing, the court considered documents from the record of conviction, including the trial transcript[2] and Vargas's trial transcript.[3] The court denied the petition. After considering the major participant and reckless indifference factors in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the court concluded: "[T]he evidence does show that petitioner, Gonzalez, intended to aid Vargas in the joint commission of a robbery. And given the risks of use of firearms and the gang membership, . . . I believe there is enough there under the felony murder theory of being a major participant in an underlying felony, acting with reckless indifference."

Gonzalez timely appealed.

---

[2] The trial court sustained Gonzalez's objection to Miller's statements to the police contained within the trial transcripts.

[3] We grant Gonzalez's request for judicial notice of Vargas's trial transcript. It appears Gonzalez introduced it at the evidentiary hearing and the trial court admitted and considered it.

DISCUSSION

I.

SECTION 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015) "significantly narrowed the scope of the felony-murder rule." (*People v. Emanuel* (2025) 17 Cal.5th 867, 875 (*Emanuel*).) "A felony-murder conviction may no longer rest on the mere commission of and intent to commit an underlying felony. If a defendant was not the actual killer or an aider and abettor acting with intent to kill, the statute now requires that the defendant be a major participant in the felony who acted with reckless indifference to human life. [Citation.] With the enactment of Senate Bill . . . 1437, the Legislature also created a vehicle for defendants previously convicted of murder under the broader and now invalidated felony-murder rule to petition for resentencing." (*Ibid.*, fn. omitted.)

At the resentencing hearing, the prosecution bears the burden of proving beyond a reasonable doubt the petitioner is guilty of murder or attempted murder under the amended law. (§ 1172.6, subd. (d)(3).) Both parties may present "new or additional evidence to meet their respective burdens." (*Ibid.*) "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid.*) If the court finds beyond a reasonable doubt the petitioner is guilty of murder or attempted murder under a theory that remains valid after the amendments to sections 188 and 189 (i.e., Senate Bill 1437), the petition is denied. (§ 1172.6, subd. (d)(3).) However, "[i]f the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and

7

enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

## II.

### LEGAL PRINCIPLES: MAJOR PARTICIPANT AND RECKLESS INDIFFERENCE

"[T]he major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions—*Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137—that articulate the constitutional limits of capital punishment for accomplices to felony murder. [Citation.] In *Enmund*, the high court held that a minor participant in an armed robbery (the getaway driver), who neither intended to kill nor had any other culpable mental state, was ineligible for the death penalty. [Citations.] A few years later, the high court revisited the issue in *Tison*, considering the case of defendants who broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the remote desert after the escapees shot them. [Citation.] The court held that 'major participation in the felony committed, combined with reckless indifference to human life,' provides a sufficient degree of culpability to be eligible for a sentence of death. [Citation.] Section 190.2, subdivision (d), added by voter initiative in 1990 [citation] was designed to codify the holding of *Tison* and, by extension, the related holding of *Enmund*. [Citation.] Section 190.2, subdivision (d), by its text, imposes an actus reus requirement, i.e., major participation in the enumerated felony, and a mens rea requirement, i.e., reckless indifference to human life." (*Emanuel, supra,* 17 Cal.5th at p. 882.)

In *Banks* and *Clark*, the California Supreme Court "endeavored to elucidate the contours of the major participant and reckless indifference

8

standards." (*Emanuel, supra,* 17 Cal.5th at p. 882.) *Banks* "observed that *Enmund* and *Tison* 'collectively place conduct on a spectrum' of culpability, 'with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions.'" (*Emanuel,* at p. 882.) *Banks* "cautioned that, though the conduct of the defendants in *Enmund* and *Tison* mark opposite ends of the spectrum for 'nonkiller felony murderers,' Enmund's actions do not represent 'the outer limit of conduct immune from death eligibility,' any more than the Tisons' actions represent the 'constitutional minimum level of culpability for death eligibility.'" (*Emanuel,* at pp. 882–883.)

"*Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life." (*People v. Strong* (2022) 13 Cal.5th 698, 706–707 (*Strong*).) It identified a series of factors to help guide the major participant inquiry. (*Banks, supra,* 61 Cal.4th at p. 803.)

"*Clark* further refined the reckless indifference inquiry." (*Strong, supra,* 13 Cal.5th at p. 707.) So have other California Supreme Court cases, such as *In re Scoggins* (2020) 9 Cal.5th 667 and recently *Emanuel.* "'[R]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death."' [Citation.] 'Examples include "the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property."' [Citation.] Although the high court's examples describe actual killers, not accomplices to felony murder, we explained they nonetheless

9

'provide some indication of the high court's view of "reckless indifference" . . . .' [Citation.] Namely, reckless indifference to human life 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'" (*Emanuel, supra*, 17 Cal.5th at p. 883.)

"[R]eckless indifference encompasses both subjective and objective elements. [Citation.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create."' [Citations.] 'As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'"'" (*Emanuel, supra*, 17 Cal.5th at p. 884.)

"''"Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory requirement.'" (*Emanuel, supra*, 17 Cal.5th at p. 884.) "[K]nowing participation in an armed robbery, standing alone, is insufficient to establish a defendant's reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at p. 706.) "The degree of risk to human life is crucial to the analysis." (*In re Scoggins, supra,* 9 Cal.5th at p. 682.)

"To aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators, *Clark* 'set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or

10

weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.' [Citation.] "'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'" [Citation.] The 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*Emanuel, supra*, 17 Cal.5th at pp. 884–885.)

III.

SUBSTANTIAL EVIDENCE SUPPORTS GONZALEZ WAS A MAJOR PARTICIPANT WHO ACTED WITH RECKLESS INDIFFERENCE TO MURO'S LIFE

We next apply these principles to the facts of this case. We review the denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence. (*Emanuel, supra*, 17 Cal.5th p. 885.) "Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

"Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) ""If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also

11

reasonably be reconciled with a contrary finding.'" [Citation.] It is well settled that "'[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the [trier of fact's finding].'"'" (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233–234.)

On appeal, Gonzalez does not contest he was a major participant. He only argues no evidence shows he was recklessly indifferent to human life. We therefore turn our attention to the nonexhaustive list of *Clark* factors relevant to the recklessly indifferent determination.

## A. *Use of or Awareness of Presence of Weapons*

"The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life. [Citation.] At the same time, the high court in *Tison* found significant the fact that Ricky and Raymond Tison 'brought an arsenal of lethal weapons into the Arizona State Prison,' and Raymond 'guarded the victims at gunpoint while they considered what next to do.' [Citation.] [¶] A defendant's *use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 618.)

Here, Gonzalez knew Vargas had a gun when Vargas approached Muro and M.S.; Gonzalez saw Vargas put a gun to the back of someone's head. After Gonzalez crossed the street to back up Vargas, both Gonzalez and Vargas threatened to shoot the victims. M.S. testified, "I [saw] a couple of people, and then they had their guns toward my head and they just told us, they told me not to look back at them, like to not turn around or they would shoot me in the head." In a police interview, Gonzalez said Vargas "was

12

yelling at [M.S. and Muro] not to look back." Furthermore, the trial court reasonably inferred Gonzalez put his gun to M.S.'s head, as M.S. testified he felt a gun to his head when Vargas shot Muro twice. Gonzalez used his gun to keep M.S. "at bay and thereby actively enabled the murder." (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089.)

Additionally, the trial court reasonably inferred Gonzalez knew, before the shooting, Vargas had a loaded gun. In a police interview, Gonzalez said he handled Vargas's loaded gun the day before the shooting. He also said he noticed Vargas's gun safety was off when Vargas was fighting with Muro. Gonzalez commented, "'As soon as you touch it, it will go. It will go blam.'" As Gonzalez handled Vargas's loaded gun the day before and was aware of the risk of Vargas's gun going off, it is reasonable to believe Gonzalez knew Vargas was carrying a loaded gun before the shooting.

A trial court could also reasonably infer Gonzalez had a loaded gun. As Gonzalez thought one of the victims had a gun, a trial court could infer he was considering the possibility of an armed confrontation when he crossed the street with his gun. He also told M.S., "'Don't turn around or I'll shoot you in the head.'" "A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 13.) Gonzalez's words and conduct here support such an inference. This *Clark* factor weighs in favor of a finding of reckless indifference.

B. *Physical Presence at the Scene and Opportunity To Restrain Confederates or Aid Victims*

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who

13

personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark, supra*, 63 Cal.4th at p. 619.)

"But where violence unfolds 'quickly,' a defendant may 'lack[] control' over the actions of his confederates." (*Emanuel, supra*, 17 Cal.5th at p. 892.) "[A] rapidly unfolding crime" does not necessarily foreclose "a finding of reckless indifference to human life. But where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so. [Citation.] This requires some awareness of the risk of impending lethal violence and time to react." (*Ibid.*)

"A defendant's actions after the shooting may also bear on the defendant's mental state. [Citation.] For example, the high court took into account the Tison brothers' failure to render aid to the victims after the shooting when it concluded that they acted with reckless indifference to human life. [Citation.] But we have said that when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state." (*In re Scoggins, supra*, 9 Cal.5th at p. 679.)

Here, Gonzalez's actions enabled the robbery and murder. He saw Vargas point a gun at one of the victims and thought one of the victims

14

had a gun. Rather than avoid the violence, Gonzalez embraced it. He decided to cross the street to back up Vargas, his fellow gang member, electing to intervene in a potential gunfight. That is a crucial fact indicating Gonzalez's state of mind just before the shooting. Even though Gonzalez no longer viewed the victims as rival gang members after he crossed the street, the evidence shows he still thought he needed to back up Vargas in the robbery and a potential gunfight, contrary to Gonzalez's assertions in his reply brief. He thereafter held M.S. at gunpoint and stood near Vargas and Muro at the time of the shooting. At no point did Gonzalez restrain Vargas. Gonzalez was aware "of the risk of impending lethal violence" and had "'the time to observe and react before the murder.'" (*Emanuel, supra*, 17 Cal.5th at p. 892.) His actions reflected he knowingly created a grave risk of death.

Gonzalez argues he "could not have been expected to restrain Vargas." He asserts the shooting happened behind him and he therefore could not see what Vargas was doing. Although the trial court found the shooting occurred behind Gonzalez, our record does not specify where Vargas and Muro were in relation to Gonzalez. M.S. testified he caught a glimpse of people behind him when he was held at gunpoint and recalled seeing three people behind him. But that does not necessarily imply Muro and Vargas were behind Gonzalez. Indeed, in a police interview, Gonzalez said he saw Muro standing when the shooting occurred.

After the shooting, Gonzalez fled. We recognize the circumstances of defendants' flight can make it difficult to infer their state of mind. (*Emanuel, supra*, 17 Cal.5th at p. 894.) But in the context of Gonzalez's conduct before the shooting, his conduct after the shooting further reflected his reckless indifference to the grave risk that Muro could be killed. Gonzalez laid M.S. on the ground and threatened him again, "'Just don't look back or

I'll shoot.'" Gonzalez did not render aid to Muro or call for help. Instead, Gonzalez retained M.S.'s bracelet and fled to the car without regard for Muro's welfare. He drove around to find Vargas and picked up Vargas; they then fled together. This *Clark* factor weighs in favor of a finding of reckless indifference.

## C. Duration of the Crime

"A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence. 'Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. . . . Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" [citation], possibly culminating in murder.'" (*Emanuel, supra*, 17 Cal.5th at p. 886.)

Here, the duration of the crime was brief. M.S. and Muro were not restrained for a prolonged period before Vargas shot Muro. This *Clark* factor is neutral here. "[I]t did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Emanuel, supra*, 17 Cal.5th at p. 886.)

## D. Knowledge of Cohort's Likelihood of Killing

"A defendant's knowledge of factors bearing on a cohort's likelihood of killing [is] significant to the analysis of reckless indifference to human life. Defendant's knowledge of such factors may be evident before the felony or may occur during the felony." (*Clark, supra*, 63 Cal.4th at p. 621.) "A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.'" (*Ibid.*)

16

As we explained *ante*, Gonzalez thought one of the victims had a gun and crossed the street to back up Vargas in a possible gunfight during the commission of a robbery. He also knew Vargas was carrying a loaded gun and observed the gun's safety was off during the confrontation with M.S. and Muro. These particular circumstances indicate Gonzalez knew Vargas was willing to use lethal force. A trial court therefore could reasonably infer Gonzalez was recklessly indifferent to human life.

Gonzalez argues the evidence shows he knew Vargas had committed armed robberies in the past and, whenever Vargas threatened to shoot if a victim fled, Vargas never did when the victim did so. While the evidence shows Vargas never shot his gun in those previous armed robberies, the evidence of what happened the day of the killing indicates Gonzalez's reckless indifference.

*E. Efforts Taken To Minimize the Risk of Violence*

"[A] defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis." (*Clark, supra*, 63 Cal.4th at p. 622.) "But the existence of evidence that defendant made some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life," due to "the two-part nature of the mens rea analysis for recklessness." (*Ibid.*) "Where an 'objective evaluation of the circumstances' of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing. [Citation.] Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony. [Citation.] In such a case, then, the absence of efforts to minimize the risk of

17

violence cannot be said to weigh in favor of a finding of reckless indifference." (*Emanuel, supra*, 17 Cal.5th at p. 888.) "Efforts at the planning stage to minimize the potential for violence . . . are viewed as a distinct factor from efforts to restrain confederates once the felony is underway." (*Id.* at pp. 887–888.)

There is no evidence indicating Gonzalez or his coparticipants developed detailed plans for the robbery. Nor does the evidence show Gonzalez sought to minimize the violence beforehand. Given the little planning beforehand, the location and time of the killing shed little to no light on Gonzalez's state of mind.

Gonzalez argues the evidence shows he did not expect any violence. In support, he cites evidence Gonzalez was angry with Vargas for shooting Muro after the shooting occurred. In a police interview, Gonzalez said he was "very angry" with Vargas for shooting Muro. In Vargas's trial, one witness, who was in the getaway car with Gonzalez, Miller, and Vargas after the shooting, testified Gonzalez and Miller yelled at Vargas. She also testified Gonzalez and Miller told Vargas that he was "going to regret it for the rest of his life" and he was "going to get taxed for that" (i.e., "[h]e is going to get his ass kicked"). But, here, where Gonzalez crossed the street, carrying a gun, to back up Vargas, because Gonzalez thought one of the victims had a gun, the trial court reasonably concluded Gonzalez was recklessly indifferent to human life: that is, "the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator [was] graver than the risk of violence inherent in any violent felony." (*Emanuel, supra*, 17 Cal.5th at p. 889; see *Clark, supra*, 63 Cal.4th at p. 623 [noting the dissent in *Tison* mentioned how the Tison brothers expressed regret over shooting but that fact, by itself, was insufficient "to foreclose the majority's holding that the

18

brothers might have nonetheless exhibited reckless indifference to human life"].)

*F. Totality of the Circumstances*

In sum, the evidence shows Vargas put a gun to someone's head. From across the street, Gonzalez noticed one of the victims acting if he had a gun, prompting Gonzalez to cross the street to back up Vargas in a possible gunfight. Gonzalez knew Vargas's gun was loaded. Gonzalez was also armed and pointed his gun at M.S.'s head to keep him at bay, enabling Vargas to shoot Muro. At no point did Gonzalez restrain Vargas just before and during the confrontation with M.S. and Muro. The duration of the robbery and shooting was brief. After the shooting, Gonzalez fled to the car, picked up Vargas, and escaped with Vargas. Given our substantial evidence standard of review, the evidence shows Gonzalez was recklessly indifferent to Muro's life, even if he did not "specifically desire that death as the outcome of his actions." (*Emanuel, supra*, 17 Cal.5th at p. 883.)

IV.

GONZALEZ'S OTHER ARGUMENTS FAIL

Gonzalez presents two additional arguments. First, he argues no evidence shows Gonzalez was recklessly indifferent to Muro's life, based on dictionary definitions of the words reckless and indifferent. We need not consider this argument, as we follow the California Supreme Court's decisions on major participants who act with reckless indifference to human life. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [California Supreme Court decisions "are binding upon and must be followed by all the state courts of California"].)

Second, Gonzalez argues he did not participate in the robbery of Muro; he asserts he robbed only M.S. We disagree. The evidence shows

19

Gonzalaz went across the street to back up Vargas in the robbery and shooting of Muro, as we explained *ante*. After the robbery and shooting, Gonzalez fled together with Vargas. Substantial evidence therefore supports the trial court finding that Gonzalez and Vargas jointly engaged in the robbery of Muro.

## DISPOSITION

The postjudgment order is affirmed.


                                        MOTOIKE, ACTING P. J.

WE CONCUR:


MOORE, J.


SANCHEZ, J.

20